JOHN BLACK, JOSEPH SMITH and BENJAMIN JONES *v.* JAMES
SHREEVE and others.

A., B., C. and others were constituted a body corporate, with a certain capital to be
divided into shares, and authorized to construct a rail or McAdamized road. A loan
becoming necessary to complete the road, it was resolved, at a meeting of the Di-
rectors and stockholders, that the Company should borrow a certain sum. The
money could not be borrowed on the credit of the Company, and A., B. and C. bor-
rowed the money on their individual credit, and advanced it as a loan to the Com-
pany; and the Company, to secure the repayment thereof, with interest, executed
to A., B. and C. an obligation conditioned for the payment of said sum in five years,
with interest semi-annually, and a mortgage of all the lands contained within the
bounds of their road as located, graded, &c., and all the materials of which said
road was constructed, and the appendages thereof, and all dividends, proceeds and
profits which might thereafter be declared or accrue from the use of the road. And
the Company, by a clause in the mortgage, covenanted.that the proceeds and profits
arising from the road should be applied, in the first place, at the end of each half
year from the date of the mortgage, to the payment of the half year's interest. And
in order to indemnify A., B. and C. against more than their proportionate part of
any loss that might accrue by reason of any insufficiency of the mortgaged property
to pay the sum so loaned, certain other stockholders of the Company, together with
A., B. and C., entered into an agreement under seal, by which the said other stock-
holders agreed with A., B. and C. that if the mortgaged property should be insuffi-
cient to pay the said sum and interest, so that any loss or deficiency should happen,
each of them, and each of the said A., B. and C. should bear an equal portion of
such loss or deficiency; and that if any of them should, before or at the time such
loss or deficiency should be ascertained, become or be unable to pay his proportion-
ate share thereof, then, such of them as should remain solvent and able should sus-
tain such loss equally with the said A., B. and C. And they further covenanted and
agreed to and with the said A., B. and C., that if the mortgaged property should
prove insufficient to pay said sum and interest, so that a loss or deficiency should
happen, then they, their executors, &c., would forthwith pay such sum to A., B. and
C., their executors, &c., as would divide said loss or deficiency equally between such
of them as remain solvent at the time such loss or deficiency should be ascertained;
and that the said A., B. and C., severally, should bear an equal part of such loss.
The mortgage becoming payable and remaining unpaid, A., B. and C. filed their fore-
closure bill, and obtained a decree for the sale of the mortgaged property; and it
was sold by the Sheriff. The amount of the sales was insufficient to pay the mort-
gage; and the amount of the deficiency was ascertained by and on the day of the
sale. A., B. and C. filed their bill, charging, that certain of the parties to the said
agreement (naming them) were, at the time when such deficiency was ascertained,
unable to pay their respective portions thereof; and that certain other parties to
the said agreement (naming them) remained and were solvent and able to pay their
respective proportions of such deficiency, and were the only parties to the said
agreement, other than the complainants, that remained and were solvent and able

as aforesaid ; and these last named persons only were made defendants in the bill. The bill prayed that the defendants might discover whether they were solvent and able to pay their respective proportions of the deficiency, or any part and how much of their said proportions; and that they might be decreed to bear the said loss and deficiency equally with the complainants; and that if it should appear by the said discovery, or otherwise, that at the time when said deficiency was ascertained any or either of the defendants was unable to pay his proportion, then, that such of the defendants as then were solvent and able might be decreed to pay to the complainants their respective proportions of the deficiency.

The construction of the agreement was held to be, that the loss which should accrue, either from the deficiency of the mortgaged premises or from inability in any of the parties to the agreement to pay their full proportion of the deficiency, should be borne equally by such of the parties to the agreement as should be able to bear an equal proportion of such whole loss with each of the complainants; and that, therefore, all the parties to the agreement, other than the complainants, should have been made parties defendants in the bill.

If, upon the true construction of an agreement set out in the bill, subscribers to it who are not made defendants should have been made defendants, the defect of parties may be taken advantage of by demurrer, though the complainant, in his bill, has put a construction on the agreement which would make it unnecessary to make such subscribers defendants.

*Held,* that the complexity of the said agreement, and the multiplicity of suits it might give rise to at law, were grounds on which a court of equity might entertain a bill for the adjustment of the contribution called for by the agreement in one suit.

One of the subscribers to the said agreement had died, after the amount of the deficiency was ascertained, leaving a will of which C., D. and E. were appointed executors. C., in his individual capacity, was a complainant on the bill, and D. and E., the other two of the said executors, were made defendants as such executors.

*Held,* that it was not necessary that C. should be made a defendant as one of the said executors.

A demurrer can only be founded on a fact or omission appearing in the bill. It cannot set up a fact or omission not appearing in the bill and thereupon demur.

*Held,* that the terms of the said mortgage required a sale under it of whatever could be sold under it; and that such sale and the proceeds of it fixed the amount of the deficiency.

On the 11th of June, 1846, John Black, Joseph Smith and Benj. Jones exhibited their bill stating that on the 11th Feb., 1833, the Legislature of this State passed an act entitled " An act to incorporate the Delaware and Jobstown rail or McAdamized road Co.," by the 1st sec. of which it was enacted, that the said John Black, &c., should be a body corporate &c., and be capable of holding and conveying real or personal estate, &c. That by the 2d sec. of said act it was enacted, that the capital stock of the corporation should be $60,000, with liberty to increase it to $200,000, and should be divided into shares of $50

28

each. And by the 5th section, that five directors should form a board, who, or a majority of them, should be competent to transact the business of the corporation, and make by-laws, rules, and regulations, respecting the management of the stock and property of the Co. That by the 6th section, the corporation was authorized to survey, lay out, construct and repair a rail or McAdamized road from the river Del., at the mouth of Craft's creek, to the vicinity of New Lisbon, following the route in said act designated; with liberty, nevertheless, given by the 17th sec. of said act to alter such parts of said route as the Co. might deem proper, subject in said alteration to the restrictions in that section mentioned. And, by the 15th section, that said act should be deemed and taken to be a public act.

That the stock was subscribed and apportioned, and on the 3d June, 1833, directors were chosen, and the Co. duly organized and proceeded to effect the object of their incorporation by surveying, laying out and constructing a railroad in accordance with the provisions of the act.

That on or about Jan. 21, 1834, the Legislature passed a supplement to the act; by the 5th sec. of which supplement it was enacted, that the said Co. should thereafter be known by the name of " The Delaware and Atlantic railroad Company."

That numerous difficulties and embarrassments impeded and oppressed the Co. in the construction of their said road; the most important of which was the inadequacy of its funds and the deficiency of means within its control for the prosecution of such a work; which difficulties increased until on or about Jan. 7, 1835, when a general meeting of the directors and stockholders was held, upon due notice, for the purpose of examining into the affairs of the Co., and the state of the road, and devising means to extricate the Co. from its embarrassments and to complete the road. That at said meeting, which was numerously attended, and at which the complainants Black and Smith were present, the complainant Jones being absent, a statement of the affairs of the Co. was submitted to the meeting, by which it appeared that on the 30th Dec., 1834, the debts and liabilities of the Co., including $9772,06, being the sum estimated by the engineers of the Co. to be necessary to complete the road, amounted to $52,822,13 ;

which debts and liabilities consisted of $4000, borrowed from the Philadelphia bank; $2000 borrowed from the Buck's bank, Pa., and $500 borrowed from the Farmers' bank of New Jersey, and a large sum due to various individuals for lands, materials, work and labor, and money borrowed; among which last sums $1240,09 was due to Andrew M. Jones; $12,417,75 to Messrs. A. and G. Ralston; $1724 to R. S. Johnson, and $96,75 to Daniel White; together with large sums of money due and owing to each of the complainants.

That at the same meeting an examination of the state of the road was made, by which it appeared that it was embanked, excavated and graded from the Delaware to the head of Lisbon pond, and that the iron and other rails were laid upon the road a part of the distance between the points aforesaid; but that a considerable part of the road between said points was still without iron rails, and that none were in the possession of the Co., and that $9772 would be required for the purchase of said rails, and for the other expenditures necessary to complete the said road, so as to fulfil the object for which its construction had been undertaken, and to enable the Co. to derive from it a revenue.

That from said statement of the affairs of the Co., it further appeared that the receipts of the Co. up to Dec. 30, 1834, amounted as the complainants have been informed and believe, to $58,823,80, including sundry loans made to the Co., by banks and individuals, a part of which was still unpaid, as above stated, and including $44015, being the whole amount realized up to that date from the stock of the Co. subscribed and taken, though the subscriptions read the sum of $60,050, and though all the installments had been called for and required, a number of the stockholders having failed to pay, in whole or in part, the sums due from them.

That by the said statement it further appeared that, out of the said $58,823,80, so received by the Co., disbursements had been made up to the said date, for and on account of the Co., and for and on account of the road, to the amount of $56,569,59; leaving in the treasury at that date $2,254,20; while its road was unfinished and the Co. embarrassed with numerous and heavy debts; that payments to the amount of $52,822,13 must be made by the

Co. before the road could be completed and the Co. relieved from its debts and liabilities; and that the only means the Co. had or could resort to for the payment of the said $52,822,13 was the said balance of $2,254,20, and the further sum of $16,035, due from the stockholders as aforesaid; so that even if the last sum was promptly paid, there would still be a deficiency of $34,532 for the payment of its debts and liabilities, and the completion of the road.

That from the said statement it became apparent to the directors and stockholders attending the meeting that a new loan must be made, or that the road must be left in its unfinished state, and the money already paid by the stockholders be sunk. That, urged by these considerations, it was resolved and determined by the directors of the Co., and by the stockholders assembled at said meeting, that the Co. should borrow $35,000. That a committee consisting of Chalkly Atkinson and the complainants Black and Jones, were appointed to negotiate the said loan for and on the credit of the Company. That a knowledge of the embarrassment of the Co., and of the unfinished state of the road generally existed, and in consequence the efforts of the said committee to borrow the said $35,000 on the credit of the Co. and pledge of the road were unavailing, and that the committee so reported to a second general meeting of the directors and stockholders of the Co., held on the 23d of the same month of January. That numerous attempts were afterwards made by and on behalf of the Co. to procure the said loan, but without success. That the stockholders in arrears as aforesaid, either from inability or disinclination, failed to pay up their arrearages, and the small balance aforesaid in the treasury was rapidly diminishing under the necessary current expenditures of the Co., and the times of payment of several of the heaviest loans already made by the Co. were rapidly approaching, and, if not paid at maturity, it was apparent that the credit of the Co. already shaken, would be entirely prostrated.

That at this crisis in the affairs of the Co, the complainants were induced, by an offer of the securities hereinafter stated, and more especially by the offer of the covenant or agreement herein after set forth, to borrow upon their credit the said $35,000 and

advance it as a loan to and for the use of the Co. ; and the said sum was so borrowed by the complainants and was lent, upon the faith of the said securities, by the complainants, to and for the use of the Co.

That, in order to secure to the complainants the repayment of the said $35,000, with the interest that might accrue thereon, the Co. executed and delivered to the complainants a bond or obligation, by order of the Co. and of the directors thereof, sealed with the seal of the Co., and signed by Thomas Haynes, then secretary of the Co., dated Feb. 2, 1835, conditioned for the payment to the complainants of the said sum of $35,000, in five years, with interest thereon semi-annually.

That in order to secure the payment of said bond the said Co. executed and delivered to the complainants a mortgage, by order as aforesaid, and sealed and signed as aforesaid, bearing even date with the said bond, by which the Co. mortgaged to the complainants all the lands contained within the bounds of their said railroad, as at the last mentioned date actually located, graded ,excavated and embanked from the Delaware river to the head of New Lisbon pond, and all the materials of which the said road was constructed, and the appendages thereof, and all dividends, proceeds and profits which might thereafter be declared, grow due or become payable from the use of the said road, together with the hereditaments and appurtenances thereunto belonging ; and all the estate, right, title &c., of the said Co. of in or to the same. And that said Co., in and by the said mortgage, did covenant and agree to and with the complainants, that the proceeds and profits arising from the road should be applied, in the first place, at the end of each half year from the date of said mortgage, to the payment of the half year's interest which should be then due on said $35,000, before any dividend of such proceeds and profits should be made among the stockholders, and that no dividend of such proceeds and profits should at any time thereafter be made before the said debt of $35,000 should be fully paid, until all interest due upon the said sum of $35,000 at the time of declaring such dividend should be satisfied, and then a dividend of such part of said proceeds and profits only as might remain after

the payment of all interest then accrued upon the said debt of $35,000 should be declared among the stockholders.

That in order to indemnify the complainants against more than a proportionate part of any loss that might arise in consequence of the corporate property so mortgaged to the complainants proving insufficient to pay the sum so loaned by the complainants to the Company, and in consequence of an agreement to that effect, made and entered into between the parties hereinafter next mentioned, previous to the consent of the complainants to loan the said sum to the Company, and upon the faith and security of which said agreement the complainants were mainly induced to make the said loan, James Shreeve, Clayton G. Atkinson, Chalkley Atkinson, Jon. Smith, Timothy Field, Thomas Haines, Jon. Scattergood, Richard Jones, Philip R. Dakin, Thos. Black, Jacob Ridgway, Restore S. Lamb, Jas. Newbold, John B. Bispham, John Chambers, Jos. Burr, Nathan Atkinson, Amzi B. Wood, together with the complainants, all being stockholders of the Company, did execute, enter into and deliver a covenant or agreement, dated Feb. 2, 1835, as follows (it is given at length) : " To all &c., we, (giving the names last above mentioned, to and including the name of Amzi B. Wood,) send greeting." It then recites that the Company have borrowed of John Black, Jos. Smith and Benjamin Jones, also stockholders in the Company, $35,000, to be applied towards completing the road and its appendages ; and that the Company had given their bond and mortgage (stating the terms of the mortgage) to the said Black, Smith and Jones, bearing even date with these presents ; and that they whose names are subscribed and seals affixed have agreed with the said Black, Smith and Jones, that in case the corporate property so mortgaged should prove insufficient to pay the said sum and its interest, so that a loss or deficiency should happen, that in such event each of them and each of the said Black, Smith and Jones, should bear an equal portion of such loss or deficiency. And that in the event that any of them who had signed this instrument should, before or at the time such loss or deficiency shall be ascertained, become or be unable to pay his proportion of such loss or deficiency, that in such case such of them as remain solvent and able shall bear and

sustain such loss equally with the said Black, Smith and Jones, that is to say, each of them who remain solvent to bear an equal part thereof with each of them the said Black, Smith and Jones, and then provides that, in order to confirm said agreement and give it legal operation, they whose names are thereto subscribed and seals affixed do covenant and agree to and with the said Black, Smith and Jones, that in case the said corporate property so mortgaged to said Black, Smith and Jones should prove insufficient to pay said sum and interest, so that a loss or deficiency should happen, then they, their executors &c., should and would forthwith pay such sum to said Black, Smith and Jones, their executors &c., as will divide said loss or deficiency equally between such of them as remain solvent at the time such loss or deficiency is ascertained and the said Black, Smith and Jones, that is to say, each of the said several individuals is to bear an equal part of such loss.

That it was upon the faith and security of the said covenant that the complainants were induced to make said loan of $35,000 to the Company, and that without it the said loan could not have been obtained from them.

That the said loan afforded but temporary relief to the Company, and that, on or about May 28, 1836, as the complainants have been informed and believe, the Company executed and delivered a certain other mortgage on the said railroad, premises and property, as well as upon other premises and property not so mortgaged, to the said Thomas Black, James Newbold and Jon. Smith, to secure $14,165 04, or some other sum; and that numerous judgments were recovered by different individuals against the said Company, in the Supreme Court and in the Common Pleas of Burlington.

That, the principal and interest of the complainants' said mortgage remaining unpaid, except the sum of $1,067 50 paid in 1835 on account of interest, the complainants, in January, 1844, filed their bill of foreclosure on their said mortgage; and such proceedings were thereupon had that, in July, 1844, a decree was made for the sale of the said railroad, lands and premises mentioned in the complainants' said mortgage, and all the materials of which the said the road was constructed, and the

appurtenances and appendages thereto and thereof, and all dividends, proceeds and profits of the said road, and all and singular, the hereditaments and appurtenances thereunto belonging or in any wise appertaining; to raise and satisfy $53,765 83, the amount reported by the Master to be due on the said mortgage, with interest thereon from the date of said decree, with the complainants' costs; and that a *fi. fa.* issue &c.    That a *fi. fa.* was issued accordingly, returnable to the April term, 1845.

That the Sheriff, after having advertised &c., and after making one adjournment, on the 2d of June, 1845, sold the said railroad, lands, premises, materials, dividends, proceeds and profits, with the appendages, and all and singular the hereditaments and appurtenances thereunto belonging.    That the Sheriff, in the first place, set up and exposed to sale the dividends, proceeds and profits above mentioned ; and Richard Jones, a defendant to this bill, bid for the same $117 31, and the said dividends, proceeds and profits were struck off to him for that sum ; and that the Sheriff, in the second place, exposed to sale the said railroad, land, premises and materials, with the appendages, and the hereditaments and appurtenances thereunto belonging, and the said Richard Jones having bid therefor $1,000, the same were struck off to him for that sum; and that, after deducting &c., there remained, on the said 2d day of June, $54,522 89.    That the loss and deficiency and the amount thereof were ascertained on the said 2d of June, 1845.    The bill then states the death of James Newbold and Jon. Smith, parties to the said covenant, and makes their representatives parties.    That said Newbold died before said 2d of June, 1845, and Jon. Smith died after that day.

That on the said 2d of June, when the said loss and deficiency were ascertained, the parties to the said covenant, other than the complainants, who then remained and were solvent and able, and the estates of such of the said other parties who had died previous thereto which remained solvent and able, became and were and still are liable and bound to bear and sustain the said loss and deficiency equally with the complainants.

That upon the solvency and ability of the said other parties and estates depends their liability to the complainants and their obligation to pay the complainants their several proportions of

said loss or deficiency, and the amount of the proportions to be paid depends on the number of the said other parties and estates remaining solvent and able.  That the solvency and ability of a party or an estate to pay a specified sum at any given time, except in extreme and notorious cases, is a fact exclusively in the knowledge of the party himself, or of the representatives of such estate, and is not capable of proof by any other party without a discovery from such party himself or such representatives.

The bill charges that on the said 2d June, and for a long time before, Thomas Haynes, Timothy Field, Jon. Scattergood, Clayton G. Atkinson, Chalkley Atkinson and John B. Bispham, parties to the said covenant, had severally become and were notoriously unable to pay their respective proportions of the said loss and deficiency; and that Philip R. Dakin, Jacob Ridgway, Jos. Burr and Amzi B. Wood and other parties to the said covenant, had died before said 2d of June, and that on that day their respective estates were notoriously unable to pay their respective proportions of said loss and deficiency.  That the complainants have been informed and believe, and therefore charge the fact to be, and that the same will appear by a discovery from the defendants hereto, that, on the said 2d of June, James Shreeve, Restore S. Lamb, John Chambers, Richard Jones, Nathan Atkinson and Thos. Black, other parties to the said covenant, and other defendants hereto, and the said Jon. Smith, another party to the said covenant, and whose executors or some of them are parties hereto, remained and were solvent and able to pay their respective proportions of said loss and deficiency, and that the estate of the said James Newbold, deceased, and the said administrators thereof, remained and were able to pay the proportion of the said loss to be borne by the said James Newbold; and that, on the said 2d of June, the said James Shreeve, Restore S. Lamb, John Chambers, Richard Jones, Nathan Atkinson, Thos. Black and Jon. Smith, as well as the estate of the said James Newbold, deceased, and the said administrators thereof, remained and were solvent and able to pay to the complainants such a sum of money as would divide the said loss and deficiency equally between the said parties to the said covenant and said estates remaining solvent and able as aforesaid and the

complainants; and that each of them was able to bear an equal part of said loss and deficiency with each of the complainants. And the bill charges that, on the said 2d of June, the said Jas. Shreeve, Restore S. Lamb, John Chambers, Richard Jones, Nathan Atkinson, Thos. Black and Jonathan Smith were the only parties to the said covenant, other than the complainants, then living that remained and were solvent and able as aforesaid, and that the estate of the said James Newbold, deceased, was the only one of the estates of the parties thereto who were dead that remained and was solvent and able as aforesaid ; and that they, therefore, on the said 2d of June, became and were each liable to pay to the complainants such a sum of money as would divide the said loss and deficiency equally between the last mentioned persons and estate and the complainants.

That the whole of said loss and deficiency remains unsatisfied ; and, after deducting therefrom the sum of $14,877 95, the part or proportion thereof to be borne and sustained by the complainants, there remains $39,674 94 which, with the interest thereon from said 2d June, is now due and payable to the complainants from and by the said James Shreeve, Restore S. Lamb, John Chambers, Richard Jones, Nathan Atkinson, Thos. Black and the estate of the said James Newbold and the said administrators thereof, and the estate of the said Jon. Smith and the said executors thereof ; that is to say, an equal proportion from each.

That whether the said last mentioned persons and estates were, on the said 2d of June, solvent and able, as aforesaid, are facts exclusively within the knowledge of said persons and of the said representatives of said estates; of which proof cannot be made by the complainants ; and that they are advised that they can not safely proceed in any action, either at law or in equity, to recover &c. without a discovery from the said last mentioned persons and representatives, respectively, whether, on the said 2d of June, they were able to pay their respective proportions of said loss and deficiency, and such sums as would divide the said loss and deficiency equally between said last mentioned persons and estates and the complainants.

That they have frequently and in a friendly manner applied &c.

The bill prays that the defendants, and each of them may set forth and discover whether, on the said 2d of June, the said Jas. Shreeve, Restore S. Lamb, John Chambers, Richard Jones, Nathan Atkinson, Thos. Black and Jon. Smith were solvent and able to pay their respective proportions of said deficiency, or how much of their said proportions they were able to pay ; and the same as to the estate of Newbold ; and that each of the said defendants may be decreed to bear and sustain the said loss and deficiency equally with the complainants ; and that an account may be taken of what is due and owing to the complainants upon the said covenant ; and that the defendants may be decreed to pay &c. ; or, if it shall appear by the said discovery, or otherwise, that on the said 2d of June any or either of said defendants James Shreeve &c., or Jon. Smith, since deceased, or the estate of said Jas. Newbold, who was then dead, were unable to pay his or its equal proportion of said deficiency, that then such of said defendants and estates as then were solvent and able may be decreed to pay to the complainants the amount due them as aforesaid, each paying an equal proportion ; and for further relief.

James Smith, Restore S. Lamb, John Chambers, Richard Jones, Nathan Atkinson, Thos. Black, James Shreeve and Barclay White, Executors &c. of Jon. Smith, dec'd, and Caleb Newbold, Jr., and Richard C. Shreeve, Administrators &c. of Jas. Newbold, dec'd, are the persons made defendants.

To this bill a demurrer was filed by all the defendants ; and for causes of demurrer they say,

1st, That the other parties to the said covenant, naming them, ought to have been made defendants.

2d, That Jas. Smith, one of the Executors of Jon. Smith, ought to have been made a defendant.

3d, That the bill does not state who nor how many of the stockholders or directors of the Company were present at the alleged meetings of said stockholders on the 9th and 23d of Jan'y, 1835, when it was resolved to negotiate said loan ; nor what authority those who were present had to resolve to negotiate said loan.

4th, That the bill does not state that the directors and stock-

holders, or either of them, had notice of said meeting on the 23d Jan'y, 1835.

5th, That the said covenant set out in the bill is only in aid of the mortgage, and the mortgaged premises, which were the primary fund for the payment of the loan; and that it does not appear that the mortgaged property has first been legally and rightfully applied to the payment of said loan.

6th, That the said Company, in and by the mortgage aforesaid, (to which the said covenant was collateral,) covenanted that the proceeds and profits arising from said railroad should be applied, at the end of each half year from the date of the mortgage, to the payment of the interest on said loan, as appears by the bill, and it is not shewn or stated by the bill that such appropriations were made.

7th, That on the matters stated in the bill the complainants had a full and effectual remedy at law.

8th, That the complainants have not in their bill shewn any sufficient matter of equity to entitle them to the relief sought by the bill against these defendants.

*W. L. Dayton* and *P. D. Vroom*, in support of the demurrer. They cited 16 *Ves.* 326; 6 *Mad.* 113; 2 *Dick.* 738; 3 *Atk.* 406; 2 *Railway Cases* 756; *Ang. & Ames on Corp.* 340; 13 *Serg. & Rawle* 210.

*R. D. Spencer* and *W. Halsted,* contra. They cited 1 *Green's Ch.* 288; 1 *Story's Eq.* sec. 33, 478, 483, 496, 7; 14 *Ves.* 164; *Platt on Cov.* 117; 2 *Bos. & Pul.* 268, 272; *Story's Eq.* sec. 469, 477, 492, 3, *Ib.* sec. 71, 67, note 4, 69, note 1; 1 *Jac. & Walk.* 234; 2 *Chan. Ca.* 200; *Story's Eq.* sec. 730, 850; 6 *John. Ch.* 398, 401, 405, 408; *Story's Eq. Pl.* sec. 237, 452, note 3; *Edw. on Parties,* page 3, sec. 1; *Jeremy's Mitford,* 280, 1; 3 *Cranch* 220; *Welford on Eq. Pl.* 69; 10 *Simons* 79; 2 *Dick.* 738; 3 *Atk.* 406, 341; 16 *Ves.* 326; 1 *Paige* 384; *Story's Eq. Pl.* sec. 447, 8; *Stephens on Pl.* 344, 5; 4 *Day's Rep.* 323; 2 *Halst. Rep.* 98; 1 *Gall.* 94; 2 *H. Bl.* 125; 4 *Iredell's Ch.* 107; *Rev. Stat.* 136, sec. 20; 11 *Conn. Rep.* 112; 4 *Harr. & McHen.* 21; 1 *A. K. Marsh.* 469, 1 *Coxe's*

*Cas.* 321; 1 *Rand. Rep.* 332, 328; 1 *Eq. Ca. Ab.* 113, *Pl.* 1, 5; 2 *Hill's Ch.* 210; 10 *Gill & John.* 65, 103; 2 *Vern.* 103; 4 *John. Ch.* 334, 7.

THE CHANCELLOR.    The question proper to be first considered is, what is the true construction of the covenant as to whether any of the covenanters who may be unable to pay the whole of his proportion of the loss or deficiency is to be absolved altogether from paying anything, or is liable to pay so much of his proportion as he may be able to pay.

The instrument recites, that the subscribers to it have agreed with the complainants that, if the property mortgaged shall prove insufficient to pay the sum loaned, so that a loss or deficiency shall happen, each of them and each of the complainants shall bear an equal portion of such loss or deficiency; and that in case any of them shall, before or at the time when such loss or deficiency shall be ascertained, become or be unable to pay his proportion of such loss or deficiency, then, such of them as remain solvent and able shall bear such loss equally with each of the complainants.    And the parties to the instrument then covenant that, if a loss or deficiency shall happen, they will pay to the complainants such sum as will divide said loss or deficiency, equally, between such of them as remain solvent at the time such loss or deficiency is ascertained and each of the complainants. It is shortly this : they recite that they have agreed that each of them shall pay an equal portion of the loss or deficiency with each of the complainants ; and that if any of them shall, at the time when such loss or deficiency shall be ascertained, be unable to pay his proportion of such loss or deficiency, then such of them as remain solvent and able shall bear such loss equally with each of the complainants ; and then covenant that if a loss or deficiency happen they will pay to the complainants such sum as will divide said loss or deficiency, equally, between such of them as remain solvent and each of the complainants.

I cannot think that it was the intention of this instrument that if, when the loss or deficiency should be ascertained, one of the parties should be able to pay nine-tenths of his proportion of the loss, he should pay nothing at all if he was unable to pay also

the remaining tenth.  Nor do I think that the language of the instrument requires such a construction.  It seems to me that the true construction of the instrument, as a whole, is, that the loss which shall arise, either from the deficiency of the mortgaged premises or from inability in any of the parties who subscribe the instrument to pay their full proportion of such deficiency, shall be borne equally by such of the subscribers as shall be able to bear an equal proportion of such whole loss with each of the complainants.

The other construction contended for would, it appears to me, be so unreasonable, and so difficult, I may say almost impossible to be carried out, that it is difficult to imagine that it could have been the sense of the parties.  Why should not a party able to pay a half, or other proportion of his share of the loss, pay it.  And how would it be possible to ascertain that a party able to pay nine-tenths of his proportion of the deficiency was not able to pay the other tenth.  Could it possibly be done in any other way than by suing him for his proportion of the deficiency, and selling his property on judgment and execution.  And can it be that, if on such a sale his property, by reason of a slender attendance of bidders, should bring a tenth less than the amount of the judgment, the product of the sale would belong to the defendant in the judgment?  A jury might, from the testimony before them, believe that one of these parties had property sufficient to pay the whole of his proportion and give a verdict accordingly, and yet, on a sale on the judgment and execution, the proceeds of the sale of that property might fall short; in which case, the sale would shew that the verdict and judgment were wrong, and that the sale should never have been made.

Again, it is contended that the construction of the instrument is, that if any of the subscribers to it should not be able to pay his whole portion at the time the deficiency should be ascertained he should pay nothing.  Now, how on the trial of a suit against one for his share of the deficiency, had, it may be, several years after the deficiency had been ascertained, would it be possible to show whether the defendant was able or not at the time the deficiency was ascertained?  But, suppose he was able then, and was found so to be, and judgment was obtained against him and ex-

ecution issued, and on the sale of his property the proceeds fell short of paying his proportion. What then? The verdict and judgment may be right and must be taken to be so, for he may have been able at the time the deficiency was ascertained, and that was the point of inquiry on the trial. Must not the sum raised by the sale, though less than his proportion of the deficiency, be paid in such case, on account of his share of the deficiency?

Here then would be a case in which, though a part only of one's proportion of the deficiency should be raised, it would be required to be paid, though he could not pay the whole.

Again, suppose one at the time of the trial, should be abundantly able to pay his full proportion of the deficiency, and should set up that, though able at the time of the trial, he was not able at the time when the deficiency was ascertained, how would it be possible to settle such a question as that; and does the instrument really mean that such a defense might be set up.

I think the construction contended for on the part of the complainants cannot be the true one; but that the construction I have above suggested is the true construction. If I am right in this, it follows, that all the subscribers to the instrument should have been made parties defendants.

Is there any reason founded on the frame of the bill why the demurrer for want of parties should not be allowed? There is no allegation in the bill that such of the said subscribers as are not made defendants were, at the time when the deficiency was ascertained, or are now insolvent. The allegation is, that Thomas Haynes and other of the said subscribers, (naming them,) on the 2d of June, 1845, the time stated in the bill as the time when the deficiency was ascertained, had become and were unable to pay their respective proportions of such deficiency. They may, notwithstanding such allegation, each of them have been able to pay more or less of their respective proportions of the deficiency.

We have, then, an instrument set out at length in the bill, which (as is now thought,) requires every subscriber able to pay any part of his proportion of the deficiency to be made a party. The complainants in the bill put a construction on the instru-

ment which they suppose relieves them from the necessity of ma-
king any subscriber a party unless he was able to pay all his pro-
portion; and the bill is demurred to for want of parties. Does
the demurrer admit the correctness of the complainants' construc-
tion of the instrument? I apprehend not. If upon the true con-
struction of an instrument set out in the bill, subscribers to it
who are not made defendants should have been made defendants,
the defect of parties may be taken advantage of by demurrer,
though the complainant in his bill has put a construction on the
instrument which would make it unnecessary to make such sub-
scribers defendants. The construction I have given to the instru-
ment as to the liability of the subscribers to it, that is, that each was
liable for such part of his proportion of the deficiency as he was
able to pay, notwithstanding his inability to pay the whole of his
proportion, disposes, I think of two other of the causes of demur-
rer assigned, namely, that the complainants have a full and effec-
tual remedy at law; and that they have shown by their bill no
sufficient matter of equity to entitle them to relief in this court.

As to these causes of demurrer, I think *a little reflection* will
shew that the demurrer cannot be sustained for either of them.
If the plaintiffs are put to proceed at law, they must adopt one of
two courses; either sue each of the covenanters for his share of
the deficiency, and proceed to judgment and execution, and in
that way ascertain whether each is able to pay his proportion of
the deficiency; in which case, if it turn out that one is unable to
pay, a new set of suits against such as are able would be neces-
ary, in order to recover from each one who is able, his aliquot
part of the loss arising from the inability of any; and this might
go an *ad infinitum,* so to speak; for if, in the second set of suits,
one of the defendants should be unable to pay his proportion of
such last mentioned loss, a third set of suits would be necessary
against such as remained able, for their aliquot part of the loss
arising from this last mentioned failure; and so on; or else the
complainants must take the course of suing such only of the cov-
enanters as they may think they can show are the only ones able
to pay any thing, and rely on proving to the satisfaction of each
jury the total inability of all who are not sued to pay any thing
at all, according to my construction of the covenant, or their ina-

bility to pay the whole of their respective proportions of the deficiency, though able to pay a part of it, on the complainant's construction of the covenant; a more difficult matter still; and if one of the juries should not be satisfied of the total inability of any one not sued, or of his inability to pay all his portion though able to pay a part of it, according as the construction of the contract may be, and should therefore, by their verdict, fix a different ratio of contribution, the recoveries in all the other cases would be wrong in amount.

It seems to me that the complexity of this covenant, and the multiplicity of suits, and the successive sets of suits it might give rise to at law, are grounds on which this court may properly entertain a bill for the adjustment of the contribution called for by the covenant in one suit.

Another cause of demurrer assigned is, that Joseph Smith, one of the executors of Jonathan Smith, deceased, ought to have been made a party defendant.

Joseph Smith is one of the complainants, one of the three persons who made the loan to the Co., and who are seeking by this their bill, from the covenanters, the proportions of the respective covenanters of the sum borrowed. Jonathan Smith, since dec'd, was one of the covenanters, and bound to contribute his proportion of the deficiency. Jonathan Smith died after the 2d of June, 1845, the day on which the bill states the amount of the deficiency to have been ascertained, leaving a will of which he appointed James Shreeve, Barclay White and the said Joseph Smith, executors. Joseph Smith, in his individual capacity, is a complainant in the bill, and James Shreeve and Barclay White, the other two executors of the will of Jonathan Smith, are made defendants as such executors. The objection is, that Joseph Smith is not made a defendant as one of the executors of the will of Jonathan Smith.

It is clear that a man cannot in his individual capacity sue himself in his capacity as executor. Can he in his individual capacity sue himself and two others as executors of a will; or can he, because he is joined in his individual capacity with two other complainants, suing in their individual capacity, make himself as executor, either alone or with other executors of the same will, a defendant in the suit in which he in his individual capacity is a

29

co-complainant. I think not. He cannot at the same time and in the same suit act both against and for the estate. In this bill he is seeking a decree against the estate; and the two other executors of the estate are made defendants. This is all that is required and all that can be proper.

Another cause of demurrer assigned is, that the Co., in and by the mortgage given by the Co., to secure the payment of the money loaned by the complainants, (the covenant being to secure to the complainants such portion of the loan as the mortgaged premises might be insufficient to pay,) covenanted that the proceeds and profits arising from the railroad should be applied, at the end of each half year from the date of the mortgage, to the payment of the interest, and that it is not shown or stated by the bill that such appropriation was made.

To this it may be answered, first: if there were any proceeds and profits to be applied to the payment of the interest, it was as much the business of the covenanters as of the complainants to see that the company so applied them; the covenanters and the complainants being all members of the same company or corporation. But again, it does not appear by the bill that there were any proceeds and profits which were not appropriated. A demurrer can only be founded on a fact or omission appearing in the bill. It cannot set up a fact or omission not appearing in the bill and thereupon demur.

Another cause of demurrer assigned is, that the covenant set out in the bill as made by these defendants is only in aid of the mortgage and the mortgaged premises; that said mortgaged property is the primary fund for the payment of the said loan; and that it does not appear that said mortgaged property has first been legally and rightfully applied to the payment of said loan.

The meaning of this I suppose to be, that all the property mortgaged to secure the loan has not been sold or otherwise applied for that purpose, (I do not suppose that the words "legally and rightfully" can extend the idea beyond this,) and that, inasmuch as the covenant provides only for the payment of the deficiency after the mortgaged property, i. e., all the mortgaged property has been applied, the deficiency contemplated and to be provided for cannot be known until all the mortgaged property is ap-

plied.  And I think this the correct idea resulting from the nature of the covenant.   Certainly the complainants could not, after selling and applying half the property mortgaged towards paying the loan, stop there and call on the covenanters for the difference between the proceeds of half the mortgaged property and the amount of the loan, as the deficiency contemplated.  If the bill shewed that state of things, it would be demurrable.

The question then is, have the mortgagees by their proceedings on the mortgage applied all the mortgaged property towards the payment of the money loaned ?

What was mortgaged ?   The language of the mortgage is, all the lands contained within the bounds of said rail road as at the date of the mortgage actually located, graded, excavated and embanked from the Delaware river to the head of New Lisbon pond, and all the materials of which said road was constructed, and the appendages thereof, and all dividends, proceeds and profits which might thereafter be declared, grow due or become payable from the use of the said road.   It is a mortgage of the road and the materials of which it was constructed and all dividends, proceeds and profits to be declared, grow due or become payable from the use of the road.

Can it be supposed that this language extends the mortgage to dividends, proceeds and profits which might be declared, grow due or become payable from the use of the road, after the road and the materials of which it was constructed should be sold under the mortgage ?

It is said that the sale under the mortgage passed nothing to the purchaser except such lands, if any, as were outside of the road ; that the charter provides that the road shall be a public highway ; that the purchaser under the mortgage did not take the franchises ; that the Co. could not mortgage the franchises ; that the purchaser could not remove the rails ; that the mortgage and the foreclosure of it could not affect the public; that the Co. had the right or franchise of charging tolls, and the public had the right to travel ; that the purchaser could take neither the franchise, nor the road, nor the materials of which it was constructed ; that the decree on this mortgage should have been for the sequestra-

tion of the tolls; that this is the only kind of decree that could be taken on this mortgage.

On the other side it is admitted, that the franchises were not mortgaged or intended to be, and that they could not be; and it is said, that if the franchises were not mortgaged, then they could not be sold under this mortgage; and if the complainants have sold all that was intended to be mortgaged the covenant takes hold; that the bill states distinctly that all the property mortgaged was sold, and the demurrer admits it; that if the road remains, and the franchises, then the Company still have them; that there is a power in the charter to convey any real or personal estate; that this has been held in our Court of Chancery to include a power to mortgage; that it does not appear by the bill that there are any tolls; that sequestration could only be of the surplus after repairs; and that it would destroy the Company to sequestrate the tolls, leaving nothing for expenses and repairs.

The bond was payable at a specified time, at the expiration of five years; and the Company mortgaged the lands, &c., and dividends, &c., to secure the payment of the bond; and the covenanters covenanted to pay the deficiency after the application of the mortgaged premises. This shows that the parties acted on the idea that the Company could mortgage something, and that the property the Company could mortgage was such that it could be sold at the expiration of the mortgage, and the amount of the deficiency ascertained. This excludes the possibility of their contemplating a sequestration of tolls; for if under this mortgage tolls were to be sequestered, the amount of the deficiency to be paid by the complainants could never be ascertained. If it be necessary under this mortgage to go into a sequestration of tolls, then, inasmuch as tolls will be receivable as long as the Company and road exist, the primary fund could never be exhausted.

I am satisfied that the parties contemplated a sale under the mortgage of whatever could be sold under it, and that such sale and the proceeds of it should fix the deficiency to be made up by the covenanters.

Any mistake that may have been made at the sale as to what

the purchaser would get on a sale under this mortgage, if any such mistake was made, cannot enter into our present inquiry.

I think that the only cause of demurrer that is sustainable is that for want of parties.